**STATE of Missouri, Appellant,**

**v.**

**Tyrone C. BROWN, Respondent.**

**No. WD 73142.**

Missouri Court of Appeals,
Western District.

Sept. 4, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 2, 2012.

Application for Transfer Denied
Nov. 20, 2012.

Karen Louise Kramer and James Farnsworth, Jefferson City, MO, for appellant.

Patrick W. Peters, Kansas City, MO, for respondent.

Division Three: KAREN KING MITCHELL, P.J., JAMES M. SMART, JR., and GARY D. WITT, JJ.

JAMES M. SMART, JR., Judge.

The State of Missouri appeals the order of the Jackson County Circuit Court sustaining Tyrone Brown's motion to suppress evidence. The State argues that the trial court erroneously granted the motion to suppress because the searches were lawful. The State contends that Brown lacked standing to challenge the warrantless search of a rental vehicle that had been previously driven by Brown, but that the search was nevertheless lawful by virtue of the automobile exception to the warrant requirement. The State also contends that the searches of two residences related to Defendant Brown were lawful because they were conducted pursuant to valid search warrants. We agree and reverse the trial court's decision suppressing the evidence.

### Statement of Facts

On January 23, 2008, several men, armed with weapons, forcibly entered the home of Ramona Poddig–Jenkins in Jack-

son County and took property from the premises. The men were not identified at that time. Several months later, after the events described below revealed a connection between Tyrone Brown and the robbery, a grand jury indicted Brown on one count of first-degree robbery (§ 569.020, RSMo Cum.Supp.2008),[1] one count of armed criminal action (§ 571.015), and one count of first-degree burglary (§ 569.160), all in connection with the home-invasion robbery. Before trial, Brown moved to suppress all of the evidence as having been obtained unlawfully in violation of his Fourth Amendment rights. After a hearing, the court granted the motion to suppress. The State appeals.

In returning to the factual background, we start with the fact that, according to a later drafted search warrant application and testimony of police officers, two months after the home-invasion robbery, but before police had identified suspects, detectives with the Kansas City Police Department received information from a confidential informant that was seemingly unrelated to the robbery in question. The informant stated that Tyrone Brown and two other men used a residence described as 3129 Norton to hold meetings for the "Five–Ace–Deuce" gang. The informant mentioned that Terry Allen and Andre Simmons, gang leaders, met there with Tyrone Brown and others to discuss criminal activity. The source also said that Terry Allen was a leader of the "Bounce Out Boys," a branch of the "Five–Ace–Deuce" gang. The source said that Allen was motivating younger members of the gang to shoot and kill police during traffic stops. The source provided police with a map of the location and description of the residence that he said was 3129 Norton in Kansas City. The source provided informa-

tion concerning crimes the gang had been involved in. When the detectives looked for the house, they discovered that the residence (which, according to street maps, should have been designated 3127 Norton) had 3129 displayed on the outside of the house. According to the police affidavit later furnished in connection with an application for a search warrant, the confidential source who provided information about the gang was a "gang affiliate," who had been "proven" to be reliable, according to police, based on "other investigations" the police had conducted.

The house on Norton was owned by Brown's mother, Trassa Brown. The water account was in her name. The gas account was in the name of Leo Wright.

Early the next day (after the conversation with the confidential source) at about 2:00 a.m., the police were called to investigate a shooting at 2915 Swope Parkway in Kansas City, after a group of gunshot victims went to the hospital. According to the later filed police affidavit, the victims purported not to know the identity of their assailants, describing them only as "black males." The shooting took place on a private parking lot near a building occupied by the Beta Lambda Educational Foundation.

In the lot, officers found broken glass and numerous shell casings, including casings from .40 caliber, 9 mm, and 7.62 mm ammunition. A tan Chevy Malibu was parked in the lot near the shell casings. One of the officers at the scene looked through the window of the car and saw a black semi-automatic handgun on the floor behind the driver's seat. There was no reason to believe the car was somehow innocently associated with the Beta Lambda Foundation, as it was closed. The po-

1. All statutory references are to the Revised Statutes of Missouri as updated by the 2008 cumulative supplement, unless stated otherwise.

lice secured the perimeter of the crime scene. No one came forward immediately to claim ownership or possession of the car. Because of the presence of the weapon in the car, the location of the vehicle, and the lack of anyone claiming rights to the car, the officers seized it as evidence and had it towed.

Sometime later that same day, March 29th, police received an anonymous tip that individuals named Terry Allen and Andre Simmons were involved in the shooting at 2915 Swope Parkway. Also that afternoon, a woman named Latasha Wright called the police station asking about the car that had been towed. She came down to retrieve it. Because the police believed the car was associated with the shooting, the police advised her of her *Miranda*[2] rights. She agreed to talk. In response to police questioning, Wright said that the car had been rented by her mother for Wright to use to get back and forth to work. On the night of the shooting, Wright said, she lent the car to a friend, Tyrone Brown. Wright said that Brown called her around 2:40 a.m. and told her there had been a shooting and that he needed to leave the car at the scene of the shooting so that the police would not suspect his involvement. At some point thereafter, Brown returned the keys to Wright. Wright said she went to the scene of the shooting to try to recover the car shortly after receiving the call from Brown. But she did not recover the car at

that time because when she arrived at the parking lot, she saw that the car was in an area secured by police for investigative purposes. Because she did not want to go past the yellow crime-scene tape, she decided to wait and later call police about being able to pick up the car.[3] Wright said she lived with Brown's mother, Trassa Brown, at 2814 Indiana. She said she did not know where Brown lived.

A search of the Malibu revealed a .380 Llama handgun, counterfeit U.S. currency, paperwork with Brown's name on it, identification belonging to Leo Wright, and a box of fifty live rounds of .380 ammunition.

On April 10th, about twelve days later, Detective DeValkenaere executed an affidavit and application for a no-knock search warrant as to the house on Norton. In his affidavit, he recited the information given above. He also included some additional assertions that we will ignore for purposes of our analysis.[4] He asked for permission to search for firearms, ammunition, cell phones, indicia of occupancy, and evidence of an assault. He described the facts known to officers about the shooting incident at 2915 Swope Parkway and provided information about the car that had reportedly been driven by Brown on the night of the shooting. He also provided information that had been provided by a "confidential source" who was "a known gang affiliate" with the "Five–Ace–Deuce" gang. The source indicated that Terry Allen was the leader of a branch of the gang, and

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** She purportedly consented to a search of the car, but the trial court later concluded that the search permission was a product of coercion and deception.

**4.** For analysis purposes, we ignore the statements found by the trial court (in the course of dealing with the warrantless search) to have been based on illegal police coercion

and trickery. We treat them as deleted because we give deference to the trial court factual and credibility findings with regard to the warrantless search. It is important to remember that when it comes to the warrant-supported search, we view the matter through the eyes of the issuing judge (the magistrate, if you will) as the matter appeared at that time, based on the four corners of the warrant application. *See State v. Neher,* 213 S.W.3d 44, 49 (Mo. banc 2007).

that Allen, Simmons, Brown, and others, had met at the Norton house to discuss criminal activity. The detective reported that Brown was a convicted felon who could not lawfully possess firearms. The gas company had information connecting Leo Wright, Latasha Wright's brother, with the Norton house as well. The affiant detective stated that he believed that firearms used in the shooting at 2915 Swope Parkway may be located in the Norton house.

The search warrant was granted that afternoon by Jackson County Judge Robert Beaird. Police searched the house on Norton pursuant to the warrant. Brown's brother was present and talked to the police. The police found guns (three handguns and a sawed-off shotgun) and ammunition, as well as property that they were soon able to identify as having been taken in the home-invasion robbery of Ms. Poddig–Jenkins. Police subsequently checked unidentified fingerprints recovered after the home invasion robbery against the fingerprints (on file) of Tyrone Brown and discovered that they matched. The police thus had credible information that Brown was involved in the home invasion robbery.

Brown's younger brother, who was present when the search warrant was executed, told police that Brown maintained another residence at 2814 Indiana. That property was also associated with Trassa Brown, Brown's mother. The police had other information linking Brown to that address, such as the fact that it was the address Brown provided to his parole officer. The Indiana address was also where Latasha Wright told police that she lived,

though she claimed not to know where Brown lived.

The detectives thereafter conducted surveillance on 2814 Indiana, observing "numerous subjects" coming and going from the residence. The police then decided to seek a search warrant for 2814 Indiana, relating all of the above matters as the basis for believing that other property taken from the Poddig–Jenkins robbery (as well as other firearms) would likely be found in Brown's possession at the house on Indiana. The affidavit again recited that Brown, as a convicted felon, was not permitted to have firearms in his possession. The police were successful in obtaining a warrant for the search of 2814 Indiana, and thereafter, they executed the search.

The search turned up several more guns and some ammunition along with other property from the home invasion robbery. A grand jury subsequently indicted Brown for the offenses of robbery, armed criminal action, and burglary in connection with the home invasion robbery.[5]

Prior to trial on the home invasion robbery, Brown filed a motion to suppress all the evidence as having been illegally obtained in violation of his rights through improper and unlawful police procedures, coercion, and trickery.

After a hearing on the motion to suppress, the court issued an order granting Brown's motion. The court concluded that the Chevy Malibu had been illegally searched because no exigent circumstances existed to excuse the police from obtaining a warrant, and because Ms. Wright's consent to search the car was the product of

---

5. We assume (but do not know) that no charges were ever filed as to the March 29th shooting because the victims apparently were not cooperative or were unable to provide information as to the assailants. We assume this on the basis that 1) the shooting victims purported not to know their assailants and provided no information other than the assailants were "black males," and 2) there is no indication that any charges were ever filed against anyone.

trickery or coercion. Further, the court found that the affidavit to search the Norton house lacked probable cause and that the subsequent search of 2814 Indiana was the fruit of the illegal search of 3129 Norton. Thus, the court suppressed all evidence and statements obtained in connection with the searches of 3129 Norton and 2814 Indiana Avenue, as well as any information obtained in the search of the Malibu. The State brought this interlocutory appeal.

### Standard of Review

Here, there were seizures conducted *without a warrant* as well as some *pursuant to warrants*. Because these two scenarios involve two different standards of review, the intersection of these two different scenarios in one motion to suppress is bound to produce enough confusion to result in considerable head-scratching. But we must undertake this daunting task *without succumbing to the temptation to syncretize the standards of review into one that reviews only the decisions of the trial judge, and views everything from the standpoint of the trial judge as the trial judge was informed at the time of the hearing.*

We will review the trial court's decision on *warrantless searches* pursuant to a "clearly erroneous" standard, deferring to the trial court on factual findings, taking all of the facts in a light favorable to the decision of the trial court. We will determine, in the case of a warrantless search, "whether the decision [of the trial court] is supported by substantial evidence, and we will not reverse the trial court's ruling unless it is clearly erroneous." *State v. Mosby,* 94 S.W.3d 410, 414–15 (Mo.App.2003). We will find that the trial court clearly erred only if its ruling leaves us with a definite and firm belief that a mistake has been made. *Id.* at 415.

And, of course, while we defer to the trial court's factual findings and credibility determinations, the question of whether the Fourth Amendment has been violated is a legal one that we review *de novo. Id.*

In contrast, when it comes to searches conducted *pursuant to a warrant,* the general rule is that our focus is on the facts recited within the four corners of the search warrant application as those recitals would have been viewed by the [so-called magistrate] judge who issued the warrant. *State v. Neher,* 213 S.W.3d 44, 49 (Mo. banc 2007); *State v. Henry,* 292 S.W.3d 358, 362 (Mo.App.2009). In *Neher,* the Missouri Supreme Court mandated that a reviewing court give "great deference to the initial judicial determination of probable cause *that was made at the time the warrant issued."* 213 S.W.3d at 49 (emphasis added). Instead of upholding the trial court decision unless it is "clearly erroneous," we uphold the decision of the *issuing judge* to issue the warrant unless *that decision* was "clearly erroneous." *Id.*

### Analysis

The State's points I through III relate to the searches of the two residences pursuant to warrants. The key to the legal inquiry in this case is whether the search warrant for the Norton house was properly issued. If so, then the 2814 Indiana warrant was also properly issued, because the information gained in the search of the Norton house provided abundant information to support the issuance of the warrant for the Indiana property. Because both warrants were obtained, in part, based upon information discovered in the warrantless search of the Chevy Malibu, we will first address the propriety of that search (the State's fourth point on appeal).

*Brown failed to prove that at the time of the search he had a legitimate expectation of privacy in the Malibu.*

### The Warrantless Searches

Regarding the search of the car, the State's first argument is that the motion to suppress should have been denied, because Brown failed to prove that he had standing to challenge the warrantless search in that Brown presented no evidence at the suppression hearing establishing either a subjective expectation of privacy in the Malibu, or that such expectation (if it existed) was a reasonable one. Brown argues that, because his suppression motion was filed pursuant to section 542.276, he established standing by virtue of the fact that the State intended to use the evidence discovered against him at trial.

### *The Accused's Reasonable Expectation of Privacy*

 "The Fourth Amendment of the United States Constitution preserves the right of the people to be secure against unreasonable searches and seizures." *Mosby*, 94 S.W.3d at 415 (quoting *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999)). But the "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered." *Id.* at 143 n. 12, 99 S.Ct. 421. The determination of whether a defendant has a legitimate expectation of privacy "is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the

expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 143 n. 12, 99 S.Ct. 421.

Section 542.296.1 authorizes any "person *aggrieved by* an unlawful seizure made by an officer and against whom there is a pending criminal proceeding growing out of the subject matter of the seizure [to] file a motion to suppress the use in evidence of the property or matter seized." (Emphasis added.) "Section 542.296.1 does not specify who is considered a person aggrieved by a search and seizure to allow the filing of a motion to suppress evidence from an alleged illegal search and seizure." *State v. Ramires*, 152 S.W.3d 385, 392 (Mo.App.2004). Brown contends that a person is "aggrieved" if the evidence obtained during a search is to be used against him at a subsequent trial. We disagree.

 The language of section 542.296.1, conferring standing to file a motion to suppress upon an "aggrieved" person, is nothing more than a codification of the standing requirements under the Fourth Amendment as set forth by the United States Supreme Court in *Rakas*; *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); and *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).[6] *Ra-*

---

**6.** The use of the term "standing" to describe a criminal defendant's right to contest the legality of a search and seizure is a bit of a misnomer, as the true issue is one of substantive Fourth Amendment doctrine. *Ramires,*

152 S.W.3d at 394 n. 3. "Nonetheless, our courts, including the Missouri Supreme Court, ... and the U.S. Supreme Court ... have continued to use 'standing' as a shorthand reference in describing whether a defen-

*mires,* 152 S.W.3d at 394. Those cases establish that "in order for a defendant to be aggrieved by an unlawful search and seizure sufficient to allow his filing of a motion to suppress . . . , there has to be a showing that he has a legitimate expectation of privacy in the place or thing searched." *Id.* at 393. "[B]eing 'aggrieved' by the search and seizure, as provided in § 542.296.1, equates to Fourth Amendment standing." *Id.* at 394. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of *his* Fourth Amendment rights infringed." *Rakas,* 439 U.S. at 134, 99 S.Ct. 421 (emphasis added).

■ It was Brown's burden, at the suppression hearing, to establish that he was "aggrieved" by the warrantless search of the Malibu.

> [A]lthough the State, in accordance with § 542.296.6, has the burden of production and persuasion to show by a preponderance of the evidence that the defendant's motion to suppress should be overruled, the defendant, in accordance with § 542.296.1, *has the initial burden of proving that he is aggrieved by the search and seizure, or stated another way, that he has Fourth Amendment standing to challenge the search and seizure by showing that he has a legitimate expectation of privacy in the place or thing searched.*

*Ramires,* 152 S.W.3d at 395 (emphasis added). We hold that Brown failed to meet the burden of showing that at the time of the search of the vehicle, he still retained a legitimate expectation of privacy in the vehicle.

dant is 'aggrieved' by the challenged search

### Permission to Drive the Rental Vehicle

The evidence indicated that the Malibu had been rented by Latasha Wright's mother for the purpose of providing Wright with a car to drive back and forth to work. Wright then allowed Brown to borrow the vehicle on the night of the shooting. Brown presented no evidence of any connection between Brown and rental company (the car's owner) or Brown and Wright's mother (the authorized user under the rental agreement). After the shooting, Brown contacted Wright, advised her that he had to leave the car because there had been a shooting and he did not want to be involved with the police, and then returned the keys to her.

At the suppression hearing, the State relied on *State v. Toolen,* 945 S.W.2d 629 (Mo.App. E.D.1997), to argue Brown's lack of standing. In *Toolen,* the Eastern District of this court held that the defendant, an alleged permissive driver of an authorized user under a car rental agreement, lacked standing to assert a Fourth Amendment violation due to his failure to establish that he possessed the car either with the consent of the owner or someone with the authority to grant possession. *Id.* at 632.

The trial court rejected the State's argument, finding that *Toolen* had been "dismissed" by the Missouri Supreme Court in *State v. Sund,* 215 S.W.3d 719, 722 n. 4 (Mo. banc 2007).

In *Sund,* the State argued that the driver of a rental car, who was operating the vehicle with the authorized renter's permission and while the authorized renter rode as a passenger, lacked standing to challenge a warrantless search. *Id.* at 722. In a footnote, the Missouri Supreme Court stated, "even were there merit to the State's questionable contention that a per-

or seizure." *Id.* (internal citations omitted).

missive driver of a rental car such as Ms. Sund lacks a reasonable expectation of privacy in the vehicle that was searched, ... Ms. Sund has standing here because the search of the vehicle was a fruit of her wrongful seizure and detention." *Id.* at 722 n. 4 (internal citations omitted). While the language in *Sund* may have been dictum, as the Court found that the defendant had standing on other grounds, *Sund* provides us with guidance as to how our Supreme Court might view the issue of a permissive driver's reasonable expectation of privacy when the permissive driver receives permission to use the vehicle from the authorized driver.

*Sund* does not, however, address the issue presented in this case, which is whether the permissive user of a permissive user (who herself had been granted only a limited right of use by the authorized driver—the right to use the vehicle to drive to and from work) has a legitimate expectation of privacy in the rental vehicle. In the same footnote set out above, the *Sund* Court cited cases showing a split of authority regarding whether a permissive, but not authorized, driver possessed a legitimate expectation of privacy. The Court compared two decisions from the Missouri Court of Appeals: *Toolen,* 945 S.W.2d at 632 (holding that the defendant-driver lacked standing to assert Fourth Amendment violation in the search of a rental car where he failed to show that the owner (rental company) authorized his use), and *State v. Sullivan,* 935 S.W.2d 747, 755 (Mo.App. S.D.1996) (holding that defendant-driver lacked standing to challenge a search of a vehicle because he was not the owner thereof); with two decisions from federal appellate courts: *United States v. Best,* 135 F.3d 1223, 1225 (8th Cir.1998), and *United States v. Thomas,* 447 F.3d 1191, 1199 (9th Cir.2006) (both holding that an individual not listed on the rental agreement has a reasonable expectation of privacy in, and standing to challenge, a search of a car where the individual received permission to use the vehicle from the authorized renter). None of these cases, however, address the factual scenario presented here: whether the permissive driver of a permissive driver of the authorized renter can have a reasonable expectation of privacy in the rented vehicle. But the decision in *Thomas* is helpful in understanding this area of the law.

The *Thomas* court noted that the federal circuit courts have developed at least three different approaches to determining when an unauthorized driver of a rental car has standing to challenge a search. 447 F.3d at 1196–97. The first approach, adopted by the Fourth, Fifth, and Tenth Circuits is a bright-line test: "An individual not listed on the rental agreement lacks standing to object to a search" because an unauthorized driver lacks a property or possessory interest in the car and, thus, does not have an expectation of privacy. *Id.* at 1196. The second approach, adopted by the Eighth Circuit, is a modified bright-line approach, which generally disallows standing "unless the unauthorized driver can show he or she had the permission of the authorized driver." *Id.* at 1197. The third approach, adopted by the Sixth Circuit, examines the totality of the circumstances in determining whether a non-authorized driver had a reasonable expectation of privacy. *Id.* Under this approach, the court will consider, among other things, "the relationship between the unauthorized driver and the lessee; ... whether the driver had the lessee's permission to use the car; and [ ] the driver's relationship with the rental company." *Id.*

In *Thomas,* the Ninth Circuit expressly adopted the Eighth Circuit's modified bright-line approach. *Id.* at 1199. While the *Sund* Court's comparison of decisions from the Eastern and Southern Districts of this court (applying the bright-line test) to decisions from the Eighth and Ninth

Circuits (applying the modified bright-line test) calls into question the continued validity of the bright-line approach previously applied by other districts of this court, it does not establish that a person in Brown's position has a legitimate expectation of privacy as a matter of law. Rather, the Court's comments in *Sund* arguably do no more than provide a hint at the possibility that the Court, if faced with this issue, might be inclined adopt one of the modified bright-line tests mentioned above.

### *The Accused Failed to Carry his Burden of Proof on the Issue of Reasonable Expectations*

■ We need not determine, however, the general proposition of whether Brown's status as a permissive driver of a permissive driver precluded any legitimate expectation of privacy. That is because even though Wright may have had the authority to grant Brown possession of the vehicle, and even though that possession may have thereby afforded Brown a legitimate expectation of privacy therein (which is something we need not decide here), any

continued validity of his expectation would not extend beyond the duration of his permissive use.[7] When Brown returned the vehicle's keys to Wright, he effectively terminated the period of his permissive use and, accordingly, any expectation of privacy he had in the vehicle. As the Malibu was neither seized nor searched until after Brown had terminated the period of his permissive use, he failed to carry his burden to establish that he had a legitimate expectation of privacy at the relevant time period.[8] Because we find that Brown failed to establish that he had a reasonable expectation of privacy in the Malibu at the time of the seizure or search, we need not decide whether the abandonment doctrine or the automobile exception apply.

Point IV is granted.

### The Warrant–Supported Searches

*The affidavits accompanying the search warrant applications were sufficient to establish probable cause.*

In the State's Points I through III, the State argues that the trial court erred in

7. We do not decide the issue of whether Brown had a legitimate expectation of privacy in the vehicle *before* he returned custody of the vehicle to Ms. Wright. Our research fails to reveal a case in which a court, faced with a factual scenario involving a driver in a similar circumstance (who failed to show permission from the owner or other specifically authorized person), found a legitimate expectation of privacy to exist. *See, e.g., United States v. Mitchell,* 106 Fed.Appx. 5, 7 (10th Cir.2004) (no legitimate expectation of privacy in defendant-driver who received permission from A, who (presumably) received permission from B (A's aunt), who was authorized user on rental agreement); *United States v. Riazco,* 91 F.3d 752, 755 (5th Cir.1996) ("It was not objectively reasonable for Riazco to expect privacy ... based on the permission of a person who was not in fact authorized to drive the rental car."); *United States v. Aispuro,* 2008 WL 1968792, *4 (N.D.Ill.2008) (defendant-driver, permissive user of permissive user of authorized driver, had no legitimate

expectation of privacy absent evidence of connection between defendant-driver and authorized driver); *United States v. $600,000 in United States Currency,* 871 F.Supp. 1397, 1400 (D.Kan.1994) (no legitimate expectation of privacy established by defendant who claimed permission to drive car granted by A, who received permission from B, who was not the registered owner of the car); *State v. Cutler,* 144 Idaho 272, 159 P.3d 909, 912–13 (Idaho App.2007) (permissive user (A) of permissive user (B) of authorized driver had no legitimate expectation of privacy in rental car absent evidence that the scope of B's permission included the ability to lend the vehicle out to A or others).

8. Because we conclude that Brown failed to meet his burden of establishing a legitimate expectation of privacy in the vehicle, whether Wright's consent to search was voluntarily given is irrelevant to the propriety of the search as to Brown.

suppressing the evidence obtained from the property searches pursuant to warrants obtained based, in part, upon information gathered from the search of the Malibu. We agree.

### Standard of Review

The points addressing the searches of the two residences present a challenge to the search warrants that purported to authorize the searches. In appellate review of the validity of a warrant, *we grant deference to the initial judicial determination of probable cause made by the issuing judge at the time of the issuance of the warrant. State v. Berry,* 801 S.W.2d 64, 66 (Mo. banc 1990). We reverse only if *that determination was clearly erroneous. Id.; State v. Hawkins,* 760 S.W.2d 926, 927 (Mo.App.1988). "The task of the appellate court is to determine, upon review of the four corners of the supporting affidavits, whether the judge had a substantial basis for concluding that probable cause existed." *State v. Dawson,* 985 S.W.2d 941, 948 (Mo.App.1999).

*Evidence Internal to the Warrant Documents:*

In *State v. Henry,* 292 S.W.3d 358 (Mo. App.2009), this court thoroughly addressed the appropriate standard when reviewing the denial of a motion to suppress where there was a warrant. There, this court held that only the issuing judge's initial determination of probable cause based on the information contained within the four corners of the affidavit is reviewed for error. *Id.* at 362. Our decision in *Henry* relied heavily on *State v. Neher,* 213 S.W.3d 44, 49 (Mo. banc 2007), in which the Missouri Supreme Court mandated that a reviewing court give "great deference to the initial judicial determination of probable cause that was made at the time the warrant issued." *Id.*

Because there is a strong preference in the Fourth Amendment for searches to be conducted pursuant to a warrant, a reviewing court should not quash a warrant by construing it in a hypertechnical, rather than a common sense, manner. *Illinois v. Gates,* 462 U.S. 213, 235–36, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The duty of a reviewing court is simply to ensure that the issuing judge had a substantial basis for determining that probable cause for the search did exist. *Id.* at 238, 103 S.Ct. 2317. In reviewing the probable cause determination, the appellate court does not look beyond the four corners of the warrant application and the supporting affidavits to obtain information that might support probable cause. *Neher,* 213 S.W.3d at 49; *State v. Laws,* 801 S.W.2d 68, 70 n. 1 (Mo. banc 1990). The court will suppress the evidence only if the issuing judge "clearly erred" in initially determining, based on the totality of the circumstances, that probable cause existed. *State v. Norman,* 133 S.W.3d 151, 159 (Mo.App.2004); *Neher,* 213 S.W.3d at 49.

"In determining whether probable cause exists, the issuing magistrate or judge must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her] ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Neher,* 213 S.W.3d at 49 (quoting *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. 2317). If the affidavit and application do not otherwise provide probable cause to support the search warrant, then the evidence seized thereunder must be excluded. *See State v. Oliver,* 293 S.W.3d 437, 443 (Mo. banc 2009); *State v. Mahsman,* 157 S.W.3d 245, 251 (Mo.App.2004); *State v. Mitchell,* 20 S.W.3d 546, 561 (Mo.App.2000); *State v.*

*Macke,* 594 S.W.2d 300, 305 (Mo.App. 1980).

*Evidence External to the Warrant Documents:*

■ If the court were evaluating only warrant-supported searches, the court would *exclude* from consideration all evidence external to the warrant documents. *Neher,* 213 S.W.3d at 49. But when the court must simultaneously consider external evidence as it relates to any *warrantless searches* that the court finds to be improper, the court may disregard observations in the warrant application that are *tainted by* the unlawful conduct. If the affidavit and application do not provide sufficient *untainted* information supporting probable cause to support the search warrant, then the evidence seized under the warrant must also be excluded. *See Oliver,* 293 S.W.3d at 443; *Mahsman,* 157 S.W.3d at 251; *Mitchell,* 20 S.W.3d at 561; *Macke,* 594 S.W.2d at 305.

■ At the same time, "[o]ur ultimate inquiry is not whether the affidavits contained allegations based upon illegally obtained evidence but whether, if setting aside all tainted allegations, the independent and lawful information stated in the affidavits suffices to show probable cause." *Macke,* 594 S.W.2d at 309. Where, as is the case here, the reviewing court, having additional knowledge beyond the "four corners" as to police misconduct and being required to excise tainted information from the affidavit, may also regard the affidavit with a more skeptical eye than would have been given by the issuing judge. *See State v. Kirby,* 128 S.W.3d 619, 621 (Mo.App. 2004). *However, the determination as to the validity of the warrant depends on whether the totality of the lawfully obtained information—as set forth in the four corners of the application for the warrant and supporting affidavit—still*

shows that there is a *"fair probability that contraband or evidence of a crime will be found." Id.; see also State v. Baker,* 103 S.W.3d 711, 720 (Mo. banc 2003). **And the question is viewed from the standpoint of the issuing judge, not the trial judge.** *Neher,* 213 S.W.3d at 49. And "[c]ommon sense is a key ingredient" in evaluating probable cause. *Mahsman,* 157 S.W.3d at 251; *State v. Hawkins,* 58 S.W.3d 12, 21 (Mo.App.2001).

■ With that in mind, we look first to the information gained when Ms. Wright came voluntarily to the police station to retrieve the car, which was suspected to be associated with a shooting event in which people were injured. Wright knew there was a shooting, and would have known that she would be asked about the car in relation to the shooting incident. She was properly advised of her rights, and she agreed to talk. She told police that Brown had borrowed the car from her; had left it at the scene; and had chosen not to retrieve the car, wishing to avoid contact with police. She said that Brown had advised her of the car's location and returned the keys to her. Although the trial court expressed skepticism at the suppression hearing as to the right of the police to tow the car, the fact is that, whether police had towed the car prior to seeking a warrant or simply placed it under surveillance (prepared to restrain anyone from removal of the car) while they pursued a warrant, one way or another, the police had the right to investigate. Wright would have ended up talking to the police before they released the car to her. She could have refused to talk and chosen instead to pursue legal action to regain possession of the car, but she chose not to do so. Although the trial court determined she did not knowingly sign the consent to search the car, the evidence indicates that her communications with police

as to the facts of the car and who was driving it the night before were not subject to any legal challenge. Therefore, we conclude that references in the warrant application and affidavit to Wright's comments and the information gained therefrom were properly included in the affidavit, regardless of whether the search of the vehicle was consensual.

We next look to other aspects of the warrant. The affidavit and application for the warrant as to the Norton house included information about the shooting event at 2915 Swope Parkway at about 2:00 a.m. on March 29th. The affidavit reported that the shooters were "unknown black males." The issuing judge would be expected to know that this is police jargon for saying that the shooting victims denied knowing who it was that shot them and provided no information other than skin color as to the identity of the attackers.[9] While these actions do not prove that the shooting incident was gang-related, it seems quite consistent with the notion that the shooting was a gang incident.

Also included was information gained prior to the shooting event from a purported "gang affiliate" of one of the branches of the "Five–Ace–Deuce" gang. The informant said that Brown was involved with the gang and that gang leaders, Allen and Simmons, held meetings at Tyrone Brown's house, which was described as 3129 Norton, the second structure north of Linwood and on the east side of Norton. The police had information that the house was owned by Trassa Brown, Brown's mother, and that the water account was in the name of Leo Wright (whom Latasha Wright, in her March 29, 2008, interview at the police station, acknowledged to be her brother).

The affidavit stated that Brown, Allen, and Simmons were "known associates." The affiant said that it had been learned through "numerous investigations" that all three of the subjects were known to be part of the Five–Ace–Deuce gang. The detective expressed the view that members of the gang were responsible for many violent crimes as well as recent burglaries in which guns were stolen. Gang members had been arrested with guns in their possession in the past. The officer wanted a no-knock search warrant due to the danger that multiple armed people could be occupying the residence. The officer wanted to search for firearms, ammunition, evidence that could be related to an assault, cell phones, and further information related to occupancy of the property.[10]

9. The trial judge and defense counsel thought that the police affidavit was expressing that the police had no idea as to who the suspects were. Defense counsel suggested there was a contradiction between police considering Brown a suspect and stating in the affidavit that the victims reported to the hospital saying they were attacked by "unknown black males." Given that the police were merely reporting (in police jargon) what the *victims* said, it could hardly be considered a contradiction. The colloquy and disagreement over semantics somehow convinced the trial judge that the detective was being stubbornly evasive when our review of the transcript does not bear that out. We fail to see what was suspicious about the detective's refusal to let defense counsel put different words in his mouth.

10. The trial judge tended to be inclined to find various things in the search warrant to be sinister. For instance, the court found something improper in the request of police to search for evidence related to occupancy of the property. The trial court forgot that, with regard to the warrant, the trial court is to consider the warrant application through the eyes of the issuing judge. The issuing judge, knowing that the police suspected that they would find a cache of firearms and ammunition, would have assumed the legitimacy of a police effort to establish *constructive* possession, as well as actual possession, of firearms

There are good reasons that the issuing judge would have found the affidavit seeking a warrant credible and would have believed that there was a decent probability that firearms and evidence of criminal acts would be found at the Norton house.

First, there were several things coming together all at the same time pointing toward a reasonable common sense finding of probable cause. This application for warrant was not based solely on the information supplied by an unidentified confidential informant as to *possible* gang activity and meetings at a particular residence. If it had been solely of that character, it presumably would have been advisable to provide significantly more detail, such as detail as to how the purported "gang affiliate" received the information in question, when he or she received it, whether it was based on personal observation, and when the gang members were last known to be there. *See, e.g., State v. Henry*, 292 S.W.3d 358 (Mo.App.2009). In any event, the source described the leadership of the Five–Ace–Deuce gang, tied Tyrone Brown to the gang, and described a location where meetings were held to discuss criminal activity. It is significant that shortly after this conversation with the confidential source, police were notified of the shooting incident, the facts of which, as recited in the affidavit, seemed to be consistent with a violent gang-related incident. The police also learned very quickly thereafter through Latasha Wright that Brown was tied to the car that had been left at the scene in the vicinity of fired shell casings, indicating firearms had been discharged nearby. A firearm was observable in plain view on the floor of the car. The police were also able to connect Latasha Wright to Tyrone Brown and Trassa Brown through Wright's statements. According to Wright, she resided with Trassa

Brown (Brown's mother) at 2814 Indiana, while property records connected Trassa Brown to both properties: the house on Norton and the one on Indiana.

Finally, according to the affidavit, the Five–Ace–Deuce gang was not new to police, who believed that the gang was tied to violent criminal activities. The detective stated in the affidavit that suspected members of the gang had been apprehended in possession of firearms. Brown was a convicted felon who (according to the confidential source) was part of the gang. Brown was not authorized to possess firearms.

### The Test is Not Whether the Trial Judge would have Granted the Warrants

The facts asserted in the application for warrant do not have the general aroma of something fabricated out of whole cloth. Police certainly did not dream up the shooting incident nor the interview with Latasha Wright. Given that, it also seems highly unlikely that a judge determining whether to issue the warrant would reject the notion that a knowledgeable confidential source had provided information to police about the possible gang meeting place and about the violent tendencies of the gang. A judge deliberating on the issuance of the warrant could always ask for more information or more specificity in the affidavit, but it is not apparent here that there would be a need to do so.

In *State v. Berry*, 801 S.W.2d 64 (Mo. banc 1990), police received an anonymous phone call stating that the caller had observed marijuana in the defendant's home the previous day. The caller gave detailed information about the marijuana, such as how it was handled and potted, and described the home. *Id.* at 67. The officer

and ammunition. Evidence of occupancy

would serve this purpose.

receiving the call drove to the location and verified the accuracy of the location, the vehicle, and the exterior description, which were the only items capable of verification. *Id.* The trial court granted a later motion to suppress the marijuana. *Id.* at 65. The Supreme Court, on interlocutory appeal, reversed, holding that a neutral and detached magistrate could have made a practical, common sense decision that there existed a "fair probability" that marijuana would be found in the home in question and that a warrant should issue. *Id.*

■ In *Berry*, a key factor in the Court's decision was that the anonymous caller gave sufficiently detailed information so as to make it apparent that the informant had first hand information, rather than simply passing along second and third hand information. *Id.* Here, as in *Berry*, the person providing the information in question purported to be a "gang affiliate," which, though a somewhat amorphous term, suggests that the informant personally knew the people about whom he was providing information. Because gangs are not particularly open or public about their activities and meeting places, the knowledge this informant presented (some of which was corroborated, according to the affidavit) was suggestive of personal knowledge.[11] When one adds to that: 1) the fact that Brown was implicated through Wright as being present at the scene of the shooting on March 28th; 2) that the shooting incident may well have

been a gang-related incident; and 3) the fact that police were able to connect Brown, a convicted felon, to the residence on Norton, there would seem to be a significant degree of plausibility to all of this information, thus making it entirely reasonable for the search-warrant judge to believe that firearms associated with the shooting event and evidence of other criminal activities were likely to be discovered there.

■ There is always some degree of risk that an accusation coming from an unidentified person is merely malicious and unfounded. Accordingly, police and issuing magistrates seek to make sure that when one stacks all the evident circumstances together, there are sufficient corroborating factors to give plausibility to the accusation. *Gates,* 462 U.S. at 213, 103 S.Ct. 2317. In *Gates,* police presented an application for a search warrant based upon an anonymous letter that set out the details of an upcoming trip to Florida planned by the defendant and his wife, purportedly to pick up drugs and then return to Illinois. *Id.* at 225, 103 S.Ct. 2317. The police were able to corroborate most of the details of the trip, such as flight itinerary. *Id.* at 226, 103 S.Ct. 2317. On that basis, officers prepared their affidavit, and a judge issued the warrant. *Id.* at 226–27, 103 S.Ct. 2317. In *Gates,* there was, of course, the possible risk that the anonymous letter was a malicious accusa-

---

11. One cannot conclude, simply on the basis of generalized skepticism, that the police fabricated the confidential source. No such evidence has been produced. To the extent that the trial court so concluded, the conclusion is without evidence and is clearly erroneous. It appears that the "confidential source" may have been in jail when interviewed about the Five–Ace–Deuce gang. The source was supposed to be "confidential"; and the police owe some duty to try to protect the source's life and safety. There is no alle-

gation, or evidence so far, that the police lied about the confidential source's information in obtaining the warrant. Apart from the *Franks* exception, and from evidence of police misconduct gained from the hearing concerning a warrantless search, the key thing is to remember that it is not the information gained *after the warrant is issued* that is pertinent, but the information that the *issuing magistrate* had at the time of issuing the warrant. *Neher,* 213 S.W.3d at 49. It is easy for a trial or appellate judge to err in this regard.

tion against innocent people. However, the information provided by the source checked out to the degree it could be checked out, and the Court considered it a "practical, common sense decision, to issue the warrant." *Id.* at 238, 103 S.Ct. 2317. So here, the issuance of the warrant, based on the information Judge Beaird had at that time, made sense.[12]

### Only One Standard of Review as to the Warrant–Supported Searches

 Brown argues that the motion to suppress here was based on section 542.296, RSMo Cum.Supp.2007, rather than on the protections afforded by the Fourth Amendment of the U.S. Constitution. He claims that there are different standards of review applicable here, and that under the statute, this court owes no deference to the issuing judge. Brown lacks authority for this proposition.

Section 542.296 is a statute that does not prescribe what an unlawful seizure is other than to refer to the provisions of the state and federal constitutions and extant law. It provides that a person aggrieved by an "unlawful seizure" may file a pre-trial motion to suppress, and it addresses the procedure applicable to the motion. In the portion of the statute dealing with the grounds on which such motion may be based, the statute lists: 1) searches made "without warrant and without lawful authority"; 2) searches in which the warrant was "improper on its face" or was "illegally issued," including warrants issued without "probable cause"; 3) searches in which officers seized property not described in

the warrant or that the officer was otherwise privileged to seize; 4) searches in which the warrant was "illegally executed"; and 5) searches that in any other manner "violated the rights of the movant under section 15 of article I of the Constitution of Missouri, or the Fourth and Fourteenth Amendments of the Constitution of the United States."

 It is obvious that the statute does not purport to provide alternate definitions to such terms as "improper" or "illegal," but entirely incorporates the relevant constitutional provisions and the decisional law implementing those provisions. It is also obvious that the statute states nothing about standards of review in the case of a warrant-supported search. Defendant argues that section 542.296 is a "rule of evidence" and states that the legislature has "plenary power" to prescribe the rules of evidence, citing *State v. Williams,* 729 S.W.2d 197, 201 (Mo. banc 1987). Brown thus believes that his motion to suppress requires an analysis that is alternative to the conventional analysis. Brown forgets that even if one wishes to consider the statute a "rule of evidence," the Constitution of the United States will trump state rules of evidence. *See, e.g., Danforth v. Minnesota,* 552 U.S. 264, 280, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008); *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Therefore, we reject out of hand the notion that we do not apply the standards of review reflected in such cases as *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Neher,* 213 S.W.3d 44 (Mo. banc

---

**12.** The State also argues the "good faith" doctrine as an alternative way of upholding the searches and seizures under the warrant. Because we believe that the searches and seizures can be upheld under a traditional search warrant analysis, we need not address the "good faith" exception where there is alleged police misconduct in obtaining the

warrant. The defendant denies the good faith doctrine is applicable here because defendant's motion was filed under section 542.296 RSMo, rather than under the Fourth Amendment of the United States Constitution. For reasons explained elsewhere in this opinion, we reject that argument.

2007); and *State v. Berry,* 801 S.W.2d 64 (Mo. banc 1990).

> *Even excluding from the analysis the statements in the warrant documents that the trial court determined to be false and improper, the warrant application still provided reasonable grounds for an issuing judge to reasonably believe that the contraband would be found.*

Brown also argues that the trial court was entitled to reject the search warrants because, in determining whether the warrants were supported by probable cause, the trial court found a *Franks* violation (based on *Franks v. Delaware,* 438 U.S. 154, 164, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978): that the affidavit contained a "false statement knowingly and intentionally made"). Brown specifies that the court found that Detective Wells "falsely claimed that [Latasha] Wright consented to the search of the Malibu" and to "the search of her cell phone."

▆▆▆ *Franks* established a *limited* way for a defendant to challenge the *truthfulness* of the statements asserted in the application for warrant by showing that the statements were deliberately false or made with reckless indifference to the truth. *Id.* at 168, 98 S.Ct. 2674. The Court believed that the requirement for a warrant that there be "probable cause, supported by oath or affirmation," would be "reduced to a nullity" if a police officer were able to use "deliberately falsified allegations" to demonstrate probable cause, and, "having misled the magistrate, then was able to remain confident that the ploy was worthwhile." *Id.* Nevertheless, the Court established a limited specific procedure, including the requirement that the defendant specifically plead any alleged *Franks* violations and make an offer of proof. *Id.* at 171, 98 S.Ct. 2674. The effect of finding a *Franks* violation is that

when the trial court determines there has been "deliberate falsehood or [ ] reckless disregard for the truth" by the affiant, the trial court must set aside the false material and consider only the affidavit's remaining contents in determining whether probable cause existed at the time the warrant was issued. *Id.* at 155–56, 98 S.Ct. 2674. When a defendant has made a proper pleading and offer as required by *Franks,* the defendant is entitled to a hearing to demonstrate the contentions asserted. *Id.* at 172, 98 S.Ct. 2674.

In *Franks,* the United States Supreme Court held that:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. *In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.*

*Id.* at 155–56, 98 S.Ct. 2674 (emphasis added).

▆▆▆ A court reviewing the validity of a warrant-supported search may depart from the four corners of the affidavit for a *Franks* hearing on police misconduct that gave rise to the information used to obtain the warrant. This was not a case involving a *Franks* motion and an offer of proof in which Defendant specified he would

show that police lied about Latasha Wright's consent to search the car and her cell phone. *See Franks*, 438 U.S. at 155, 171, 98 S.Ct. 2674. In any event, because the examination of Ms. Wright and the cross-examination of the police witnesses caused the court to believe that the police had tricked and coerced Ms. Wright into purporting to consent, and because the trial court was entitled to reach that conclusion in regard to the *warrantless search* of the Malibu, we have already determined that, for purposes of analyzing the propriety of the issuance of the warrants by Judge Beaird, we would ignore the police assertions of Ms. Wright's consent that are made in the affidavit. Thus, we have already accomplished, without a *Franks* motion and hearing, the very thing that would be accomplished by a *Franks* hearing. *See id.*

▪ In a *Franks* hearing, the defendant bears the burden of persuasion because the warrant-supported search is presumed valid until the contrary is shown. Other than the issue of whether there was actual consent to the search of the Malibu and the cell phones, Defendant fails to demonstrate any intentional deceptions on the part of the police in obtaining the warrants.[13] But because we are remanding, there will be nothing to stop Defendant from filing a proper *Franks* motion and offer of proof if the Defendant plausibly believes he can show other intentionally false statements.

A similar rule (but without the specific *Franks* procedure) is applied whenever an affidavit includes information and assertions that appear to be based on unlawful police activity in violation of a subject's constitutional rights. *See, e.g., Oliver*, 293 S.W.3d at 443; *Mahsman*, 157 S.W.3d at 251; *Macke*, 594 S.W.2d at 309 (all three cases taking the position that, after setting aside *tainted* information, the untainted information in the affidavits is to be examined for sufficiency to justify the issuance of the warrant). *That is the rule we apply here.*

▪ To the extent that the trial court reasonably found improper 1) the search of the Malibu without a warrant and without the actual consent of Ms. Wright, 2) the search of the cell phone of Latasha Wright, and 3) the stop (and warrantless search) of the cell phone of another Ms. Wright who was stopped by police after leaving the Indiana house,[14] the court was entitled, in determining whether the warrant application provided probable cause, to disregard as tainted the information gained improperly thereby. *See Oliver*, 293 S.W.3d at 443. To do otherwise would encourage improper police procedure that violates someone's rights, even if not the rights of the defendant in question. The question, then, is whether the *remainder* of the information set forth in the affidavit was sufficient, viewed in retrospect, to allow it to be said that there was still sufficient untainted and properly obtained information in the affidavit to support the issuance of the warrant. This issue of Fourth Amendment law is determined *de novo*. *Mosby*, 94 S.W.3d at 414–15.

---

**13.** The State bore the burden of proof on the warrantless searches, and the court disbelieved the State's witnesses that the search of the Malibu and of the cell phones were voluntary. Presumably the court believed that the representations of consent were intentionally false. We accept that, and deal with it by disregarding those portions of the warrant application.

**14.** The trial court determined that police unlawfully stopped a person (another Ms. Wright) after a visit to 2814 Indiana, and also that the officer unlawfully viewed items on her cell phone.

Therefore, in this case, we consider whether, after the court *had set aside the information that we allow to be improper under the "clearly erroneous" standard,* the remainder of the assertions in the affidavit (those that were not shown to be obtained unlawfully or that were intentionally or recklessly false) were sufficient to support the warrant.

Brown seeks to challenge police credibility generally by pointing out that the trial court rejected the assertion in the affidavit that the confidential source had provided police with a "detailed map and description" as to the Norton house because, after the defendant requested a copy of that map in the pre-trial discovery, the State had been unable or unwilling to provide it in discovery. Therefore, Brown says, the court was warranted in concluding that the existence of such map was a complete fabrication. We disagree.

The trial judge's view that the existence of the map was fabricated assumes that it would be *highly* unusual for a sketch map of the location of a publicly visible house near Norton and Linwood to be discarded or lost after the warrant had been obtained. We cannot agree. It would seem from the affidavit (and we think one would ordinarily assume) that the purpose of the map was nothing more than to make sure the officers knew the *exact identity and location* of the house being discussed by the informant. The officers have multiple reasons for not wanting to storm the wrong house with or without a warrant. The map, of course, mattered for a while, but once the police were able to independently confirm that the house in question

referred to by the source was owned by Trassa Brown, the defendant's mother, one might not think the map itself would somehow be hugely significant. Because it appeared the "confidential source" had correctly tied the house to Brown as a place Brown might frequent (because it belonged to his mother), the independent significance of the map was diminished. Other information available to the police showed that Brown may actually reside on Indiana, rather than in the house on Norton, but we doubt it would be unusual for such a suspect to want to have a separate location for meetings and storage of weapons.

■ The standard of review governing the trial court's review of the warrant procedures does not permit the trial court to rule that the non-production of the map purportedly drawn by the source created a "strong presumption" that the affiant was fabricating. Warrant applications are not to be read by a later-reviewing judge with a highly skeptical eye, but with a common sense, practical approach, as such applications would have been read by the issuing court. *See Gates,* 462 U.S. at 235–36, 103 S.Ct. 2317; *Henry,* 292 S.W.3d at 362–63. ***Otherwise, officers have little incentive to seek a warrant.***[15]

■ No argument has been made here that because the trial court found *any* police misconduct in connection with the warrant, the trial court was *ipso facto* authorized to suppress all the evidence found pursuant to the warrant, even if the warrant would still have issued without the police misconduct. And it is proper that

---

**15.** To the extent that *new facts* are developed on remand, the ruling here that this is not a *Franks* case could cease (to that extent) to be "the law of the case." On remand, if Defendant pleads and demonstrates through a satisfactory offer of proof that there are factual assertions that are deliberate falsehoods or are recklessly indifferent to the truth, the trial court may conduct a *Franks* proceeding. A motion merely stating generally that there are police fabrications, *without* what the *Franks* Court described as an "offer of proof" of specific intentional fabrications is not sufficient. *Franks,* 438 U.S. at 171, 98 S.Ct. 2674.

no such argument is made because that is not the law. *See, e.g., Franks,* 438 U.S. at 166–68, 98 S.Ct. 2674.

The trial judge here concluded that in *its own mind* there was *not* probable cause to believe that anyone or anything connected with the shooting on March 29, 2008, would be found ten days later on April 10, 2008, at the Norton residence. It appears that this conclusion was reached because the court totally discounted the report of the confidential source as well as police representations of knowledge concerning the "Five–Ace–Deuce" gang and tying Tyrone Brown to that gang and to the use of that residence. The trial court failed to apply the proper analysis: whether or not the *issuing* judge, on consideration of all material and information in the search warrant application that was not shown to be tainted, could reasonably have believed there was probable cause. We determine, thus, that the trial court's suppression of all the evidence obtained in the search of the two residences pursuant to warrant was "clearly erroneous."

Points I through III are granted.

### Conclusion

For the foregoing reasons, the circuit court's order granting Brown's motion to suppress is reversed. The case is remanded to the trial court for further proceedings.

KAREN KING MITCHELL, Judge, concurs.

GARY D. WITT, Judge, dissents in separate opinion.

GARY D. WITT, Judge, dissenting.

While I agree that this cause should be remanded to the trial court for further proceedings, I would affirm the trial court's judgment sustaining Brown's motion to suppress regarding the evidence recovered from the automobile (Malibu) and, therefore, I dissent in part from the result of the Majority opinion. The Majority opinion (1) fails to give appropriate deference to the factual findings and credibility determinations of the trial court, (2) erroneously determines that Appellant lacked standing to raise the issue of a reasonable expectation of privacy in the rental car (Malibu), and (3) does not adequately address that this case is still ripe for a *Franks* hearing. I would affirm the trial court's judgment suppressing the evidence seized from the rental car. Further, based on the numerous constitutional violations by law enforcement, it is appropriate to remand to the trial court for further proceedings under *Franks v. Delaware,* to ensure that no evidence is improperly admitted in Brown's trial in violation of his constitutional rights. 438 U.S. 154, 164–165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978).

### Factual Background

Problematically, the Majority opinion's rendering of the relevant facts, in several places, appears to be in the light most favorable to *the State.* But in reviewing the trial court's ruling on a motion to suppress, this Court is tasked to " 'review the facts and inferences therefrom in the light most favorable to the trial court's ruling, and disregard all contrary inferences.' " *State v. Clampitt,* 364 S.W.3d 605, 608 (Mo.App. W.D.2012) (quoting *State v. Nelson,* 334 S.W.3d 189, 193 (Mo. App. W.D.2011)). Specifically, the Missouri Supreme Court has made clear that our job in reviewing a motion to suppress is to "defer[ ] to the trial court's determination of credibility and factual findings, inquiring only 'whether the decision is supported by substantial evidence, and it will be reversed only if clearly erroneous.' " *State v. Faruqi,* 344 S.W.3d 193, 199 (Mo.

banc 2011) (citation omitted). Therefore, the following is a highlight of the relevant facts, *as found by the trial court,* which are critical to this Court's disposition of the instant issue on appeal:

Det. John Failer testified that on March 29, 2008, officers were dispatched to a reported shooting by unknown black males at the Beta Lamb Educational Foundation, 2915 Swope Parkway, Kansas City, Jackson County, Missouri. Four individuals had responded to Research Hospital suffering from gunshot wounds. At the scene, officers observed .40 caliber, 9mm and 7.62 shell casings. Left at the shooting scene were two automobiles: a tan Chevy Malibu and a darker colored vehicle. Inside the Malibu, in plain view on the floorboard behind the driver's seat, Det. Failer observed a black semi-automatic gun. The other vehicle looked like it had been shot.

Det. Failer testified that only the tan Malibu was towed to the Kansas City, Mo Police Department tow lot. At the time of the towing, Det. Failer agreed that the Mailbu (sic) was parked on private property, that he had no information stating the vehicle was involved in the shooting or that anyone was seen running to or from the vehicle.

Det. Failer agreed that the Kansas City, Missouri Police Department has towing procedures and, without objection, defendant offered Defendant's 1, a copy of such towing procedures. Pursuant to the General Towing Procedures, there is no authority (nor, would such authority pass constitutional muster) for the police to tow a vehicle from private property, even if the officers suspect such vehicle is involved in a crime. General Towing Procedures B.6 states that vehicles shall be towed "From private property when a Uniform Traffic Ticket has been issued and a subpoena has been signed by an owner, lessee, or person in charge of the private property." Towing a vehicle to the police garage is clearly a "seizure" within the meaning of the 4th Amendment. There were no exigent circumstances that would justify such seizure without a warrant, as the vehicle was within a secure crime scene.

The seizure of the Chevy Malibu was illegal, as no exigent circumstances existed to justify seizing the vehicle without a warrant and the seizure from private property was in violation of the Kansas City, Missouri Police Department's towing procedures.

**Search of 3129 Norton.** Summary. Distilling the affidavit in support of the search warrant for 3129 Norton down, officers sought a search warrant because: On March 29, 2008, unknown black males shot four black males at 2915 Swope Parkway. At the scene, officers found a Chevy Malibu and observed a black semi-automatic handgun on the rear driver's floorboard. Subsequently, police learned that Tyrone Brown had driven the vehicle to 2915 Swope Parkway. A search of the Malibu showed that the weapon found in the car—a .380 Llama—did not match shell casings found at the scene. Prior to the shooting, a confidential informant [1] told police that Bounce Out Boys is a branch of the Five–Ace–Deuce gang, and that Terry Allen is the leader of the Bounce Out Boys. The source stated that Allen

---

1. The Majority places great weight on the fact that this confidential informant was listed as a "gang affiliate" and assumes that this means that the informant was affiliated with the gang to which Brown allegedly belongs.

There is nothing in the record to support the assumption that the confidential informant was affiliated with any particular gang and an assumption that he was affiliated with a rival gang could be supported just as easily.

and other members of the Five–Ace Deuce held meetings at Tyrone Brown's house at 3129 Norton.[2] Then, on March 29, 2008, an anonymous tip was received stating Terry Allen and Andre Simmons were involved in the shooting at 2915 Swope Parkway. Based upon this information, officers sought and received a search warrant to search for and seize "Firearms; Ammunition; Trace evidence to include but not limited to blood, hair, fibers and any other microscopic evidence of an assault; Cell Phones; Indicia or occupancy, residency, ownership, management and/or control of the premises ... including but not limited to utility and telephone bills, canceled envelopes and keys."

In short, Tyrone Brown had driven a car to a party where a shooting occurred, and contained within the car was a gun that was not involved in the shooting. A confidential informant, *prior* to the shooting, stated that *Terry Allen* holds meeting at Tyrone Brown's house. And an *anonymous tip*[3] stated *Terry Allen* was involved in the shooting. The affidavit contains no suggestions that the shooting was gang related; a confidential source with generalized information about Tyrone Brown's house;[4] an anonymous tip stating persons other than Brown were involved in the shooting; no suggestion that anyone went to Tyrone Brown's house after the shooting; and no suggestion that weapons used in the shooting would be located at Tyrone Brown's house.

### The Affidavit.

This Court looks to the four corners of the affidavit. Pursuant to the affidavit in support of search warrant (State's 1) for 3129 Norton: On March 29, 2008, approximately 2:00 a.m., Kansas City, Missouri Police Officers responded to a shooting at 2915 Swope Parkway, Kansas City, Jackson County, Missouri. Four black males arrived at Research Hospital suffering from gunshot wounds. They told officers that they were in a parking lot of a party at 2915 Swope Parkway when they were shot by "*unknown black males.*"

2. There is nothing in the affidavit or evidence as to when in the past these alleged meetings may have occurred. The evidence established that the confidential informant was in prison at the time he made these statements to the police, so it is reasonable to assume that the information was at least months if not years old. *Rosencranz v. United States*, 356 F.2d 310, 316 (1st Cir.1966). ("[The affidavit] speaks, after all, of the time when an anonymous informant conveyed information to the officer, which could have been a day, a week, or months before the date of the affidavit. To make a double inference, that the undated information speaks as of a date close to that of the affidavit and that therefore the undated observation made on the strength of such information must speak as of an even more recent date would be to open the door to the unsupervised issuance of search warrants on the basis of aging information.").

3. This anonymous tip is the only statement in the affidavit that connects anyone even mentioned in the affidavit to being actively involved in the shooting in question, and does not in any way suggest that Brown was involved in the shooting. Without this uncorroborated anonymous tip, the most that is established in the affidavit is that Brown was one of a very large group of people present at a party when a shooting occurred in a parking lot across the street. *State v. Roark*, 229 S.W.3d 216 (Mo.App. W.D.2007) ("An uncorroborated anonymous tip does not even give rise to a reasonable suspicion of criminal activity, let alone probable cause.").

4. There is nothing in the affidavit or evidence that this confidential informant had been present at any of these alleged meetings or had ever even been inside of the house he described. The only thing he described was the location of the house and a description of the outside of that house, along with the now missing map that he allegedly drew of its location.

The scene of the shooting was the Beta Lambda Educational Foundation parking lot. Located in the parking lot was a tan Chevy Malibu, and officers could see a black handgun in plain view. There was no evidence that the Malibu was involved in the shooting, i.e. the vehicle had no bullet holes or other damage and no witnesses linked it to the shooting. The vehicle was parked on private property. The police towed the vehicle without a warrant, without the consent of the property owner, without the consent of the vehicle's owner or permissive driver, and according to the detective, he could point to no towing procedures which would authorize towing the vehicle. Transcript 10–12. Subject to only a few specific and well delineated exceptions, warrantless searches and seizures are deemed per se unreasonable. *State v. Ramires,* 152, S.W.3d 385, 391 (Mo.Ct.App. W.D.2004).

\* \* \*

Det. Wells was contacted by Latasha Wright concerning the Chevy Malibu. The testimony of Det. Wells and Latasha Wright was very different.

According to the affidavit, detectives located Latasha Wright. Wright told detectives that her mother had rented the Malibu for her to drive to and from work. "Wright stated that on 3/28/08 she allowed her former boyfriend Tyrone C. Brown ... to borrow the vehicle. She stated she received a phone call from Brown on 3/29/08 at 0240 hours from his cell phone, number 816–337–2317, Brown told her he had to leave the rental at the scene of a shooting. Brown told her he did not want the police to think he was involved in the shooting so he left it. Wright stated Brown brought the vehicle keys to her and she drove to the crime scene. Wright stated she observed the vehicle with police all around it so she decided not to retrieve the vehicle. Wright granted Detectives permission to process the vehicle for evidence."

Ms. Wright tells a different story. She contacted Det. Wells about getting the vehicle released and was summoned to the police station by Det. Wells to sign documents for the release of the vehicle. She signed the documents. Detective Wells left the room. According to Det. Wells, while Ms. Wright sat in an empty room, he surreptitiously listened in as she spoke on her cell phone. According to Latasha Wright, Det. Wells then came in and took her purse and cell phone. He later returned having gone through her cell phone, and began questioning her, placing her under arrest, and ultimately gaining the information he sought and releasing her.

The Court must consider the credibility of the witnesses who testified. As previously noted Det. Devalkenaere was unwilling or unable to answer simple questions directly. The credibility of a witness who refuses to testify that a document states "unknown black males" when reading those exact words on the document before him is highly suspect. In judging the credibility of Det. Wells and Latasha Wright concerning the circumstances of her "consent," the Court finds Ms. Wright more credible. Ms. Wright responded to the police station based upon a ruse that she merely needed to sign some documents to have the (illegally) seized vehicle released.

Once at the police department, after initial interrogation by Det. Wells, Wright was surreptitiously observed by Det. Wells, who then returned to the room and seized Wright's purse and cell phone. Subsequent questioning by Det. Wells of Wright shows that Wells had gone through the cell phone prior to any "consent" being given.

The credibility of Ms. Wright concerning the seizure of her cell phone is bolstered by the testimony of Det. Devalkanaere in explaining the training he has received regarding seizing and searching cell phones. According to the Detective, police can seize and search a cell phone as part of a custodial arrest as the cell phone is a "closed container." Once the arrested suspect is booked, according to Devalkanaere, the phone cannot be searched without a warrant. This confused view of the 4th Amendment will be discussed later, but this strange procedure is what Ms. Wright describes: Det. Wells seizes the phone, searched the phone, arrests Wright, has consent to search the phone signed, and then releases Wright from arrest.

Based upon the credibility of the witnesses, the Court finds that the purported "consent" to search the Malibu and Ms. Wright's cell phone was not voluntarily given.

\* \* \*

In this case, the police conducted a "car check" solely because a black female exited a house the police were watching. There was no probable cause or reasonable suspicion to stop the vehicle. "During the course of the car check Detectives observed several photos on Marshall's cell phone." Once illegally stopped, the officers found that the driver R. M., had an outstanding warrant and a suspended driver's license. Based upon the testimony before the Court, the stop of R.M. was illegal. There was no such thing as a "car check" that authorizes the police to stop a vehicle to "check" for anything. If Kansas City, Missouri Police officers are being trained, as Det. Devalkenaere testified, that the police can go through a person's cell phone incident to any arrest, this Court would suggest that such a policy

violates the very foundation upon which the 4th Amendment rests.

The affidavit continued with the results of the search of the vehicle. Inside, a .380 LLAMA handgun was located with ammunition and papers identifying Leo Wright. Leo Wright is Latasha Wright's brother. Tyrone Brown is a convicted felon. The weapon found is not of the same caliber as the weapons used in the shooting for which officers are seeking a search warrant.

Next, the affidavit refers to meeting with a confidential source on March 28, 2008, *prior to* the shooting on March 29, 2008. (Although the affidavit refers to the confidential source providing "Detectives with a detailed map and description of the residence" the state has not provided any documentation to defense counsel. Given that the state had failed to disclose "approximately 200 pages" of discovery on Monday of trial set for July 13, 2009, and that such documentation was not provided at the motion to suppress hearing, there is a strong presumption that the "detailed map and description of the residence" is a fabrication. In any event, with the burden of production and persuasion on the state, the Court finds that the paragraph referring to the confidential source does not support probable cause, due to the state's failure to provide discoverable material with must exist if the statements in the affidavit concerning the confidential source are to be considered.

\* \* \*

According to the source, Terry Allen is the leader of the "Bounce Out Boys" which is a branch of the "Five–Ace–Deuce" gang. Allen, according to this source, is motivating younger members to shoot and kill police when they are pulled over. Allen and other members of the Five–Ace–Deuce hold meetings at

Tyrone Brown's house. The source provided a detailed map and description of the residence.

A careful reading of the affidavit shows that the information purportedly provided by the confidential source regarding 3129 Norton is no more than an outside observer could observe and then provide a "detailed map and description of the residence." There is no suggestion the source had ever been inside the residence or had ever observed anyone inside the residence. There is nothing in the affidavit to suggest that the confidential source has personally observed anything.

Then, the affidavit states that "The source *had* information that Detectives proved to be reliable based on investigations they *had* conducted."

This curious language is different from what one would expect. A confidential source can be found to be reliable if, in the *past* the source has *previously* provided information to the police and *that information* was *subsequently* found to be truthful. The affidavit does not contain such language.

\*　　\*　　\*

Alternatively, the confidential informant can provide information that is based upon personal observation corroborated through other sources. In the instant case, there is nothing in the affidavit to suggest the confidential informant had ever been inside the residence or had ever observed any persons inside the residence. A "detailed map and description of the residence" provides no more information than what a casual observer from the street could provide.

Next, the affidavit states that an anonymous tip was received stating that "Terry Allen and Andre Simmons were involved in the shooting at 2915 Swope Parkway." This anonymous tip is not corroborated in any fashion and provides no additional details. This information would not support reasonable suspicion for a *Terry-stop,* much less probable cause.

\*　　\*　　\*

The next paragraph of the affidavit provides no basis for probable cause, but does raise the issue of illegal searches and seizures by the Kansas City, Missouri Police Department. The Court has previously addressed the "car check" and search and seizure of the cell phone belonging to R.M. In any event, the Court finds that the information gleaned from the "car check" does not corroborate either the confidential source or anonymous tip, and does not support probable cause to search 3129 Norton.

The next paragraph establishes that Tyrone Brown lived at 3129 Norton. Tyrone Brown has standing to contest the search.

The final paragraph purporting to support probable cause lists Tyrone Brown, Terry Allen and Andre Simmons as known associates and concludes "It is the affiant's belief the firearms used in the shooting at 2915 Swope Parkway may be located" at the house on Norton. The Court finds that "affiant's belief" is irrelevant and is not supported by probable cause.

During testimony by Dets. Devalkanaere and Wells, there was no evidence from any source, confidential or anonymous, suggesting that anyone involved in the shooting went to the house at 3129 Norton after the shooting or that guns used in the shooting would be located in the house.

**Search of 2814 Indiana Avenue.** The search warrant for 2814 Indiana Avenue was predicated upon the search and sei-

zure at 3129 Norton, which the Court has found illegal.

* * *

In the instant case, the search warrant for 2814 Indiana Avenue was based upon the illegal search of 3129 Norton, and not by means sufficiently distinguishable to purge the primary taint.

Trial Court's Order (emphasis original; footnotes added by this author).

Prior to turning to the analysis, it must be reiterated that based on our standard of review, this Court must give proper deference to the above facts as found by the trial court. *Faruqi*, 344 S.W.3d at 199. The Majority's presentation of the facts includes tucking into footnotes alarming matters such as the trial court's finding that "assertions deleted [from its discussion of the search warrant] were those found by the trial court to have been based on illegal police coercion and trickery" as well as unsupported suppositions including that the victims in the March 29 shooting "apparently were not cooperative or were unable to provide information as to the assailants."

## Analysis

### *The trial court's finding that the seizure of the automobile was illegal is supported by substantial evidence and is not clearly erroneous*

The Majority reversed the cause, determining that Brown had no legitimate expectation of privacy in the Malibu because Brown effectively terminated the period of his permissive use when he returned the vehicle's keys and therefore had no standing to challenge the seizure and search of the Malibu under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and progeny.

"[I]t is well established that a driver of a borrowed vehicle may establish a reasonable expectation of privacy in a vehicle even though that driver is not the owner of the vehicle." *Johnson v. United States*, 604 F.3d 1016, 1020 (7th Cir.2010) (additional citations omitted). In determining whether such a non-owner may claim a privacy interest in the area searched, courts consider first whether the driver manifested a subjective expectation of privacy in the area searched, in other words whether the individual has shown that "he seeks to preserve [something] as private." The second question is whether that expectation of privacy is one society would consider objectively reasonable. *Id.* The court uses concepts of property law and societal standards to determine the reasonableness of defendant's expectation. *State v. Snow*, 299 S.W.3d 710, 714 (Mo. App.2009).

The Majority explores a string of cases relating to whether a permissive user (with permission of the lessee) of a rental car has standing to assert that his or her reasonable expectation of privacy was infringed,[5] ultimately determining that the issue need not be resolved in this case. But I see the question of whether a defendant is "the permissive user of a permissive driver" versus "the permissive user of a permissive user of a permissive driver" as a non-issue in the constitutional context. The issue is much simpler. Perhaps there was a breach of contract between Wright's mother and the rental-car company, but that would not affect Brown's Fourth Amendment right to privacy. "[U]se of the car may have resulted in a

---

**5.** *For a summary of the three main approaches, see also* Matthew M. Shafae, *United States v. Thomas: Ninth Circuit Misunder-"Standing": Why Permission to Drive should* *not be necessary to create an Expectation of Privacy in a Rental Car*, 37 GOLDEN GATE U.L.REV. 579 (2007).

breach of contract between [the lessee] and the rental agency, but that does not automatically abolish Appellee's standing to contest a violation of his constitutional rights." *Parker v. Texas*, 182 S.W.3d 923, 927 (Tex.Crim.App.2006). Even if the vehicle had been stolen and the defendant did not know it had been stolen, he may still be able to establish that he had a reasonable expectation of privacy. *C.f. United States v. Cates*, 641 F.Supp.2d 613 (N.D.Tex.2009) (defendant may have established reasonable expectation of privacy in stolen vehicle had he met his burden of establishing that he did not know it was stolen). Similarly, a person who sublets an apartment may still have a reasonable expectation of privacy in the apartment even though the lease between the landlord and principal tenant prohibits a sublease. *See U.S. v. McClendon*, 86 Fed. Appx. 92 (6th Cir.2004) (unpublished opinion holding that though rental arrangement might have violated rental agreement with housing authority, the violation did not deprive defendant of a reasonable expectation of privacy). The issue properly phrased is does the defendant have an expectation of privacy in the thing searched and if so, whether society deems it "reasonable." [6]

And despite its analysis, the Majority's specific holding is almost independent of the case law it analyzes surrounding permissive users of permissive drivers:

> [E]ven if Wright had the authority to grant Brown possession of the vehicle, and even if that possession thereby afforded Brown a legitimate expectation of privacy therein, his expectation's contin-

ued validity would logically coincide with the duration of his permissive use. When Brown returned the vehicle's keys to Wright, he effectively terminated the period of his permissive use, and accordingly, any expectation of privacy he had in the vehicle. As the Malibu was neither seized nor searched until after Brown had terminated the period of his permissive use, he failed to establish that he had a legitimate expectation of privacy at the relevant time period.

Rather than determine that Brown had no reasonable expectation of privacy as a permissive driver, the Majority instead holds, that as a factual matter, Brown no longer possessed the automobile. I take issue with the Majority's decision in part because the crux of its holding—whether Defendant had effectively terminated his permissive use—is a factual resolution for the trial court and is beyond our province. Moreover, the Majority's recitation of the facts, which even though stated favorably to the State, does not indicate that there is anything clearly erroneous in the trial court's finding on the matter of the duration of Defendant's use of the vehicle:

> Wright said that Brown called her around 2:40 a.m. [the night of the shooting] and told her there had been a shooting and that he needed to leave the car at the scene of the shooting so that the police would not suspect his involvement. **At some point thereafter,** Brown returned the keys to Wright. Wright said she went to the scene of the shooting to try to recover the car **shortly after** receiving the call from Brown.

---

**6.** *See U.S. v. Baker*, 221 F.3d 438, 443 (3d Cir.2000) (Where defendant was vague about who owned the car he borrowed, court held, "a discrepancy between an individual's statement regarding the owner of the car he is driving, and the identity of the owner of the car as reflected by the title and registration, is not, enough, by itself, to destroy the driver's reasonable expectation of privacy when there is clear evidence of continuing possession and control, as well as no evidence that *the driver obtained the car illegitimately.*" (emphasis added)).

But she did not recover the car at that time because when she arrived at the parking lot, she saw that the car was in an area secured by police for investigative purposes.

(Emphasis added.)

While the record does indicate that Brown told Wright that he left the car at the scene of the shooting for her to retrieve, the record does not indicate when or how Brown "terminated his period of permissive use." It is not only unclear when Brown returned the keys to Wright in relation to when the car was seized, but it is also unclear whether the return of those keys was by itself a renunciation of possessive use. Certainly two people can share possession of a car with a single set of keys. But in any event, such factual determinations are simply inappropriate at this level of review.[7] The officer's testimony that he "couldn't open up the door" of the Malibu at the scene, is further evidence that Brown locked the vehicle before leaving it, evidencing further his expectation of privacy. Viewing the facts in the light most favorable to the trial court's ruling, the record supports the finding that Brown had a reasonable expectation of privacy in the Malibu.

As I would affirm the trial court's finding that Brown indeed had a reasonable expectation of privacy, the legality of the search is the next issue that must be addressed. A lawful seizure must not run afoul of the rights guaranteed by the Fourth Amendment to the United States Constitution, namely the rights of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "Reasonableness, therefore, is the 'touchstone' of the Fourth Amendment." *State v. Waldrup*, 331

S.W.3d 668, 672 (Mo. banc 2011). As a general rule, warrantless seizures are unreasonable and, thus, unconstitutional. *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005).

"The State can overcome the presumption that a warrantless search and seizure is unreasonable by showing that it falls within one of a carefully defined set of exceptions, many of which are based on the presence of exigent circumstances." *State v. Rutter*, 93 S.W.3d 714, 723 (Mo. banc 2002). In this case, the State argues that the seizure of the Malibu was permissible under the "automobile exception" to the warrant requirement. Specifically, the State argues, "[u]nder the automobile exception to the warrant requirement, officers who have probable cause that contraband is located within a vehicle can search anywhere in the vehicle where such contraband can be found." *State v. Irvin*, 210 S.W.3d 360, 362 (Mo.App.2006) (citation omitted). The State further argues that there was probable cause that the Malibu contained evidence related to the shooting.

The issue of whether the officers might have established probable cause to search the vehicle by way of a warrant is not before the court. The police officer testified that he could not enter the vehicle (which implies that it was locked), that everyone had scattered from the scene after the shooting (a reasonable response for anyone near where a shooting breaks out), that there was no broken glass or other damage to the Malibu, that no one was observed running to or from the Malibu, that the police had no information that the car was involved in the shooting, that another car at the scene looked like it contained bullet holes but the police chose

---

7. Factual cloudiness led the Seventh Circuit to reverse for an evidentiary hearing in a post-conviction relief setting where the issue of reasonable expectation of privacy in a borrowed vehicle was in question. *Johnson*, 604 F.3d 1016 (2010).

not to search, seize or tow it, and that the tow of the Malibu was in violation of the police department's written towing procedure. "More than bare suspicion is required to support a finding of probable cause." *State v. Matchell,* 106 S.W.3d 553, 555 (Mo.App.2003). Whether a judge might have found probable cause to seize the car is speculative. Certainly the police had the car in an area secured by crime scene tape and no one was present attempting to remove the car from the scene; therefore, there is absolutely no reason why the police could not have applied for a warrant before they towed and/or searched the car, if they in fact believed that they had probable cause to obtain a warrant. But what is clear is that the trial court's determination that Brown had an expectation of privacy and that his expectation was reasonable is not clearly erroneous.

### *This cause should be remanded for a hearing to determine whether the underlying search warrants for the two residences violated the* Franks *doctrine*

In the second part of its opinion, the Majority holds that the search warrant applications for the two residences were sufficient to establish probable cause.

The State argues that the trial court "erred in sustaining Defendant's motion to suppress the evidence obtained as a result of the search of Defendant's residence at 3127 Norton because the search and seizure did not violate the Fourth Amendment in that the search was conducted pursuant to a valid search warrant."

The Missouri Supreme Court recently outlined the following applicable law:

The Fourth Amendment to the United States Constitution guarantees that no warrant shall issue except upon probable cause supported by oath or affirmation.

*State v. Berry,* 801 S.W.2d 64, 66 (Mo. banc 1990). A neutral magistrate or judge must determine probable cause from the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In determining whether probable cause exists, the issuing magistrate or judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her] ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* The presence of such contraband or evidence need not be established at a *prima facie* level, by a preponderance of the evidence or beyond a reasonable doubt. *State v. Laws,* 801 S.W.2d 68, 70 (Mo. banc 1990).

Accordingly, in reviewing a trial court's ruling on a motion to suppress evidence seized pursuant to a search warrant, the court gives great deference to the initial judicial determination of probable cause that was made at the time the warrant issued. *Berry,* 801 S.W.2d at 66. Because there is a strong preference in the Fourth Amendment for searches to be conducted pursuant to a warrant, a reviewing court should not quash a warrant by construing it in a hypertechnical, rather than a common-sense, manner. *Gates,* 462 U.S. at 235–36, 103 S.Ct. 2317. The duty of a reviewing court is simply to ensure that the issuing judge had a substantial basis for determining that probable cause for the search did exist. *Id.* at 238, 103 S.Ct. 2317. In conducting the review of whether probable cause exists, the appellate court may not look beyond the four corners of the warrant application and the supporting affidavits. *Laws,* 801 S.W.2d at 70 n. 1. The court will only reverse if the issuing magistrate or

judge clearly erred in initially determining, based on the totality of the circumstances, that probable cause existed. *State v. Norman*, 133 S.W.3d 151, 159 (Mo.App.2004).

*State v. Neher*, 213 S.W.3d 44, 49 (Mo. banc 2007).

However, after a defendant has filed a motion to suppress attacking the validity of the warrant by challenging the veracity of the information contained in the supporting affidavits, it is well established that the initial determination of probable cause is no longer entitled to absolute deference:

> When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing". This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. It is established law that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of information, the affidavit must recite some of the underlying circumstances from which the informant concluded that relevant evidence might be discovered, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed was credible or his information reliable. Because

it is the magistrate who must determine independently whether there is probable cause, *it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment.*

*Franks v. Delaware*, 438 U.S. 154, 164–165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978) (emphasis added) (quotations and citations omitted).

"To attack the veracity of a search warrant affidavit in an attempt to void the warrant and exclude evidence, a defendant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit." *State v. Sherman*, 927 S.W.2d 350, 355 (Mo.App. W.D.1996) (citing *State v. Miller*, 815 S.W.2d 28, 33 (Mo.App. 1991)). "Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Cone v. State*, 316 S.W.3d 412, 417–18 (Mo.App. W.D.2010) (quoting *Franks*, 438 U.S. at 155, 98 S.Ct. 2674). "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.; see also State v. Mitchell*, 20 S.W.3d 546, 554–55

(Mo.App. W.D.2000) ("[D]eliberate omissions in an affidavit provide a basis to challenge a search warrant where the defendant shows '(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, [citations omitted]; and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.' ").

"Merely to allege that the affidavit contained false information does not suffice. The defendant must also show that the *affiant* knew of the falsity or submitted the affidavit with reckless disregard for its truth or falsity." *Cone v. State*, 316 S.W.3d 412, 418 (Mo.App. W.D.2010) (quoting *State v. Leisure*, 772 S.W.2d 674, 683 (Mo.App. W.D.1989) (overruled on other grounds in *Joy v. Morrison*, 254 S.W.3d 885, 888 n. 7 & 888–89 (Mo. banc 2008))) (emphasis added).

Here, the trial court was justified in its exasperation with the police conduct. The trial court found that the police fabricated testimony; engaged in illegal coercion and trickery to obtain "permission" to search the Malibu; unlawfully searched the rental car driven by Brown; were guilty of the unlawful and unconstitutional stop of R.M. under the guise of a "car check" solely because R.M. visited 2814 Indiana; were guilty of the unlawful and unconstitutional search of R.M.'s cell phone while in that automobile;[8] and were guilty of the unlawful and unconstitutional search of Wright's cell phone while she was being detained at the police station. It is also interesting to note that the police obtained the search warrants in question ostensibly to locate evidence regarding a shooting that occurred at 2915 Swope Parkway, and yet no evidence was recovered that was connected with those events.[9] It was only after the search warrant was executed that the focus of the investigation switched to the robbery that is the subject of the current charges against Brown.

Taken together, the evidence of the events leading up to the issuance of these search warrants could support the trial judge's belief that the officers in question believed that Brown was involved in criminal activity and that they bent the rules, including fabricating a confidential informant, in order to obtain a search warrant to see if they could find evidence of a crime. The trial court's determination that the police violated *multiple* persons' constitutional rights raises alarming questions as to whether these very officers did their job properly and fairly in obtaining a search warrant of the residence at 3127 Norton. To conclude otherwise would force the trial court to disregard its common sense and specific knowledge of what had transpired during the course of this investigation. Certainly, the trial court in

---

8. No greater example of the reasonable expectation of privacy a person has in a modern cell phone can be set forth than the officer's statement that when he illegally searched the cell phone of this individual he observed photos of the cell phone's owner naked and engaging in sexual relations with Brown. *See State v. Clampitt*, 364 S.W.3d 605, 610 (Mo. App. W.D.2012) (noting cases holding that individuals have a reasonable expectation of privacy in their cell phones and the information stored therein). This cell phone was locked and protected by a numerical code to prevent others from viewing its contents, further evidencing the owner's expectation of privacy.

9. The gun recovered in the Malibu was a .380 LLAMA handgun located with ammunition and papers identifying Leo Wright, Latasha Wright's brother. The weapon found was not of the same caliber as the weapons used in the shooting for which officers were seeking a search warrant and its proximity to the belongings of Leo Wright cuts against an assumption that it was possessed by Brown.

this case did make a finding that the affidavit in support of this warrant contained fabricated information regarding the "consent" of Wright for the search of the Malibu.

The Majority opinion notes that Brown did not raise a *Franks* issue in his Motion to Suppress. However, it was not until after the hearing began that the information giving rise to the *Franks* issue was obtained by Brown. (i.e. more than 200 pages of previously undisclosed discovery materials, and the officer's testimony regarding the multiple violations of the constitutional rights of various individuals in obtaining the information that gave rise to the affidavits in support of the search warrants). Certainly, Brown could have (and better practice would have been to) orally requested to amend his motion at that time to include a *Franks* allegation or in the alternative moved for a continuance so that a proper motion under *Franks* could be filed. However, the record indicates that Brown had noticed his motion up for hearing on at least three prior occasions and that each time the hearing had to be continued because one of the police officers failed to appear for the hearing, even though the officer had been subpoenaed to appear for at least one of those prior hearings. Under these circumstances, it was not unreasonable for defense counsel to proceed expeditiously once all the witnesses were finally present for the hearing. One reason that appellate courts defer to the trial court's credibility determinations is that the local trial judge not only views the testimony of the witnesses first hand, but also because the local trial judge interacts with the local prosecutors, local defense attorneys and local law enforcement officers on a regular basis and the trial judge is in a much better position to determine the credibility of those individuals than we are from a cold transcript. *cf. Goodman v. Holly An-*

*gle, LMT,* 342 S.W.3d 458, 462 (Mo.App. W.D.2011) (trial court's prior experience with counsel is a relevant consideration).

Accordingly, I would remand this matter for the trial court to allow Brown to file a proper motion under *Franks* and present any additional evidence that may be relevant to that motion. For it is only pursuant to a *Franks* analysis that the trial court can properly review the issues of this case. A *Franks* analysis will allow the trial court the opportunity to make further findings and conclusions within the relevant legal framework of *Franks* as it pertains to the Court's conclusion "that the affidavit to search 3129 Norton lacked probable cause, and ... that the search of 2814 Indiana Avenue was the fruit of the illegal search of 3129 Norton." Judgment, pg. 17. The trial court granted Brown's motion to exclude evidence only after the trial court made the following findings and conclusions that the affidavit submitted by the police for the applicable search warrant contained "a fabrication":

[T]he affidavit refers to meeting with a confidential source on March 28, 2008, *prior to* the shooting on March 29, 2008. (Although the affidavit refers to the confidential sources providing "Detectives with a detailed map and description of the residence" the state has not provided any documentation to defense counsel. Given that the state had failed to disclose "approximately 200 pages" of discovery on the Monday of trial set for July 13, 2009, and that such documentation was not provided at the motion to suppress hearing, there is a strong presumption that the "detailed map and description of the residence" is a fabrication. In any event, with the burden of production and persuasion on the state, the Court finds that the paragraph referring to the confidential sources does not support probable cause, due to the

state's failure to provide discoverable material which must exist if the statements in the affidavit concerning the confidential source are to be considered.)

The Court has concluded that, based upon the state's failure to disclose documentation regarding the confidential source, that the information regarding the source cannot be considered.

Judgment, pg. 12.

On appeal, Brown argues that "as the finder of fact, Judge Schieber [the trial court] has found what is a *Franks* violation." However, it is unclear from the record that the trial court did in fact find a *Franks* violation. The trial court never once mentioned the *Franks* opinion or any of its progeny in its judgment. Here, the absence of a *Franks* analysis can be placed upon Brown, who failed to make a specific request for a *Franks* hearing. As previously mentioned, it is incumbent upon the defendant to inject this issue before the trial court: "To attack the veracity of a search warrant affidavit in an attempt to void the warrant and exclude evidence, a defendant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit." *State v. Sherman*, 927 S.W.2d 350, 355 (Mo.App. W.D.1996) (citing *State v. Miller*, 815 S.W.2d 28, 33 (Mo.App.1991)); *see also State v. Trenter*, 85 S.W.3d 662, 670 (Mo.App. W.D.2002) ("Respondents here did make allegations of deliberate falsehood. However, the motion did not specify what portion of the affidavit was claimed to be false, nor was it supported by any offer of proof or affidavits of witnesses. There was no explanation of this omission. Such a motion does not state a cognizable claim under *Franks* ").

Here, Brown's Motion to Suppress Physical Evidence contained boilerplate language that the "search warrants were improper on their face or were illegally issued." But, as is acknowledged by the Majority, nothing would preclude Brown from filing a more specific *Franks* motion on remand. Collateral estoppel does not apply to suppression rulings due to their interlocutory nature. There is "no irregularity in hearing evidence on a motion to suppress on more than one occasion; a trial court's ruling on a motion to suppress is interlocutory and remains so up to the time the evidence is admitted." *State v. Pugh*, 600 S.W.2d 114, 117 (Mo.App. S.D. 1980); *see also State v. Merchant*, 363 S.W.3d 65 (Mo.App. E.D.2011).

The trial court's order is unclear whether its holding is a sanction based on the State's discovery violation as it pertained to the 200 pages of previously undisclosed materials and lack therein of the map allegedly made by the confidential informant, or whether instead it is based on a *Franks* violation as it pertains to the warrant in question. *See* Judgment, pg. 12. ("The Court has concluded that, based upon the state's *failure to disclose documentation* regarding the confidential source, that the information regarding the source cannot be considered."). If the trial court wishes to exclude evidence pursuant to a discovery violation, the Court must follow the mandates of our applicable law. *See* Rule 25.18; *see also State ex rel. Jackson County Prosecuting Attorney v. Prokes*, 363 S.W.3d 71 (Mo.App. W.D. 2011).

If, on the other hand, the trial court intended to issue a *Franks* order, the following should be noted by the trial court on remand. In finding "that the paragraph referring to the confidential source does not support probable cause," the trial court rested on the improper conclusion that "the burden of production and persuasion [was] on the state." But, as previous-

ly mentioned, in a *Franks* hearing the burden of proof is on the defendant. *See Cone,* 316 S.W.3d at 417 (emphasis added) ("In the event that at that hearing the allegation of perjury or reckless disregard ***is established by the defendant by a preponderance of the evidence,*** and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.").

Furthermore, the trial court made a finding that *it presumed that* the map was "a fabrication," noting that "the State has not provided the Defendant with any documents regarding this source, this interview, or this map.... The failure to provide such documents creates a presumption that either they do not exist or have been intentionally withheld. In either case, this weighs heavily against the State." The trial court concluded that therefore the confidential informant was also a fabrication. "In any event," noted the trial court, "with the burden of production and persuasion on the state, the Court finds that the paragraph referring to the confidential source does not support probable cause, due to the state's failure to provide discoverable material which must exist if the statements in the affidavit concerning the confidential source are to be considered."

But to order relief pursuant to *Franks,* the trial court must make clear and unambiguous findings that "the affiant knew of the falsity or submitted the affidavit with reckless disregard for its truth or falsity." *Cone,* 316 S.W.3d at 418. Here, the trial court's order, which only outlined the Court's presumptions, fell short of specific finding that the affidavit *in fact* contained perjured or recklessly false statements.

However, justice requires that Brown, if he chooses to do so, be allowed to properly raise a *Franks* issue and the trial court be permitted to make appropriate findings and conclusions pursuant to the above case law on remand. Were the trial court to make the requisite *Franks* findings that the police fabricated the meeting with the confidential informant in its affidavit for a warrant to search 3127 Norton, the Court would be justified in concluding that "the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *Mitchell,* 20 S.W.3d at 555. In addition to excluding the information provided by the confidential informant, when one additionally excludes the uncorroborated anonymous tip and the other evidence that the Majority also concludes was improperly obtained by the police, the affidavit in question is stripped to its bare bones.

Even if taken as true, the affidavit in this case establishes that: (1) Brown was, along with many other people, at a party where a shooting occurred in a parking lot across the street; (2) The car Brown had been in prior to the shooting had a gun in it that was not connected in any way to the shooting; (3) Brown was a member of a gang and the gang had meetings at a house where Brown resided; and (4) Brown and Terry Allen were members of the same gang.

The only thing that tied Brown or this address to involvement in the shooting was an uncorroborated anonymous tip that two other men (Terry Allen and Andre Simmons), were involved in the shooting. "An anonymous tip by itself seldom, if ever, provides reasonable suspicion that a person has committed a crime warranting a

*Terry*-stop." [10] *State v. Weddle,* 18 S.W.3d 389, 393 (Mo.App. E.D.2000). An uncorroborated anonymous tip does not even give rise to a reasonable suspicion of criminal activity, let alone probable cause. *State v. Roark,* 229 S.W.3d 216 (Mo.App. W.D.2007). Even if this anonymous tip had been corroborated in some fashion, the fact that two other men (not Brown) were involved in the shooting, there was still nothing tying Brown or this address to the shooting, except the confidential informant's statement that Brown and Terry Allen were in the same gang and that gang had at some unknown time in the past occasionally met at this house.

Here, the relevant question was (and is) whether there was probable cause to issue a warrant to search 3127 Norton. If the trial court finds a *Franks* violation and excludes the information allegedly obtained from the confidential informant, there is little left to support the warrant. Beyond the fact that some unknown person had placed the numbers 3129, instead of 3127, on the exterior of the home, the State fails to pinpoint what other proper basis it adduced in the affidavit to support the issuance of the warrant. This is of course extremely problematic because "[s]uppression ... remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Trenter,* 85 S.W.3d at 679 (quoting *U.S. v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978))).

For all of the aforementioned reasons, I would affirm the judgment suppressing the evidence seized from the Malibu and remand the cause for further proceedings on the remaining issues.

10. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).